UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------
x
UNITED STATES OF AMERICA, for
the use and benefit of W.P. SCHAEFER
CONSTRUCTION CO., INC.,

               Plaintiff,

             - against -

VETERANS CONTRACTING GROUP,
INC., and LIBERTY MUTUAL
INSURANCE COMPANY,

             Defendants.
--------------------------------------------------------
x

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
Case No. 1:11-CV-4189

*Appearances*:
| | |
|---|---|
| *For the Plaintiff:* | *For Defendants:* |
| BRUCE H. LEDERMAN, ESQ. | EVAN WIEDERKEHR, ESQ. |
| CHRISTOPHER M. TARNOK, ESQ. | Wise & Wiederkehr, LLP |
| 345 Seventh Avenue, 23rd Floor | One North Lexington Avenue |
| New York, New York 10001 | White Plains, New York 10601 |

**BLOCK, Senior District Judge:**

      Veteran's Contracting Group ("VCG") entered into a contract with the United States Department of Veteran Affairs ("United States") to restore two roads in the Cypress Hills National Cemetery. VCG obtained a payment bond with Liberty Mutual Insurance Company ("Liberty Mutual") as surety. VCG then subcontracted the majority of the work to W.P. Schaefer Construction Co., Inc. ("Schaefer").

      Schaefer brought suit against VCG and Liberty Mutual. Jurisdiction is

founded on the Miller Act, 40 U.S.C. §§ 3131-34, and 28 U.S.C. § 1367.[1]

Schaefer claims that VCG breached the subcontract. It seeks, on a *quantum meruit* theory, the value of the work performed, plus prejudgment interest. VCG responds that it terminated Schaefer for cause. By way of counterclaims, it seeks reimbursement for costs incurred to complete the contract, as well as liquidated damages.

A bench trial was held on May 15, 2013. The Court heard the testimony of William Schaefer, on behalf of Schaefer, and Gregory Masone, on behalf of VCG. Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law:

**FINDINGS OF FACT**

**A. Background Facts**

1. VCG's contract with the United States ("the Base Contract") was for $515,572. The Base Contract called for the work to be completed within 150 days after approval to begin work was given.

2. VCG subcontracted the project to Schaefer, who agreed to furnish all labor and materials and perform all work required under the Base Contract.

3. Prior to bidding on the project, Schaefer received from VCG drawings of the roads to be reconstructed. The drawings set forth the scope of Schaefer's obligations. Schaefer relied on the drawings in assessing the costs of the project.

---

[1] The Miller Act requires a payment bond for any federal public-works contract with a value of more than $100,000. *See* 40 U.S.C. § 3131(b)(2). Any person who has furnished labor or material under such a contract can sue on the bond if not paid. *See id.* § 3133(b)(1). He or she can also invoke supplemental jurisdiction to bring a state-law breach of contract claim against the contractor. *See United States ex rel. Maris Equip. Co. v. Morganti, Inc.*, 163 F. Supp. 2d 174, 179 (E.D.N.Y. 2001) ("Nothing in the Miller Act precludes a subcontractor from joining in a single action a state law breach of contract claim against the prime contractor with its Miller Act claim.").

2

4. VCG and Schaefer executed a Sub-Contractor Agreement ("the Subcontract") on March 9, 2010. The Subcontract price was $363,000. *See* Pl.'s Ex. 8. It was a form contract, prepared by VCG and without negotiation by Schaefer except as to price.

5. The Subcontract defined the scope of the work by reference to drawings provided by VCG to Schaefer. *See* Pl.'s Ex. 8, ¶ "First." It further stated that "[n]o extra work or changes under this contract will be recognized or paid for, unless agreed to in writing before the work is done or the changes are made." *Id.*, ¶ "Seventh."

6. The Subcontract stated that "time is and shall be considered the essence of the contract." Pl.'s Ex. 8, ¶ "Fifteenth." It further provided for $200 per day in liquidated damages in the event the contract was not completed on schedule. *See id.* However, the Subcontract did not give a specific date for completion, stating only "ASAP will advise." *Id.*

7. The Subcontract included the following payment provision:

> Contractor agrees that he will pay to the said Sub-contractor in monthly payments, . . . Ninety per cent (90%) of all labor and materials . . . to be paid on or about the tenth (10) of the following month.

Pl.'s Ex. 8, ¶ "Sixteenth." The remaining ten percent was designated "retainage," which was to be paid after all work was completed.

8. The Subcontract gave VCG the right to terminate Schaefer and withhold further payment "[s]hould subcontractor at any time . . . fail in any respect to p[rosecute] the work covered by this subcontract with promptness and diligence. . . ." Pl.'s Ex. 8, ¶ "Seventeenth." It further authorized VCG to take steps to complete the work after termination, and obligated Schaefer to pay damages if the costs of completion exceeded the unpaid balance of the Subcontract. *See id.*

**B. Performance**

9. On April 2, 2010, VCG notified Schaefer that no work could take place if there were any burials scheduled on Mother's Day, Father's Day, Memorial Day, or Veterans' Day.

10. The United States gave VCG approval to begin work on April 6, 2010, making the completion date under the Base Contract September 3, 2010.

11. VCG advised Schaefer that work could begin. In addition, it requested, on several

occasions, that Schaefer provide a progress schedule. Schaefer's response was that he would not provide a schedule until the job site was up and running.

12. Shortly after VCG advised him that work could begin, Schaefer asked for surveys and marker stakes to define the grades for the new roads. Masone told Schaefer to "go back to the contract," Trial Tr. 26, which specified that Schaefer was to follow the grades of the old roads.

13. Following existing grades proved to be impossible because the roads were old and dilapidated. Schaefer knew about the condition of the roads prior to executing the Subcontract. *See* Pl.'s Ex. 33; Trial Tr. 26.

14. The Subcontract was silent as to grade surveys. The Base Contract required VCG to conduct surveys, but that provision of the Base Contract was not incorporated into the Subcontract.

15. Eventually, Shaefer hired a surveyor. His invoice was $18,000; it was unpaid at the time of trial.

16. After the survey work was completed, Schaefer brought large crushing equipment to the work site. The equipment would have enabled Schaefer to crush the concrete in the existing roads and curb into small pieces suitable for use as a subbase for the new roads.

17. Cemetery personnel refused to allow Schaefer to bring the large equipment into the cemetery. As a result, Schaefer lost the cost expended in leasing and transporting the equipment from New Jersey. Further, the inability to use the heavy equipment meant that Schaefer would have to use smaller equipment and do some work by hand—significantly increasing the cost and time needed to complete the project.

18. The Court specifically credits Schaefer's testimony that Masone represented to him that the cemetery would allow him to bring the large machinery onto the property, and that he relied on that representation in bidding the work.

19. When informed of the problem with the equipment, Masone told Schaefer that VCG would not pay for the increased cost, and that Schaefer might be subject to penalties if the project was delayed. Although Schaefer considered walking off the job at that point, he did not do so.

20. Shortly thereafter, on April 30, 2010, VCG sent Schaefer the first of many notices to cure. The April 30th notice claimed that Schaefer had failed to provide certificates of liability and workers' compensation insurance, and gave him 24 hours to correct

the omission.  Schaefer apparently complied because nothing further came of the notice.

21. As Schaefer began to demolish the existing roads, water from melting snow begun to flood the roadbeds. Schaefer advised VCG that the ground conditions prevented him from using automated curb-forming machines and would require a "much slower method of [manual] curb placement." Pl.'s Ex. 19.

22. Schaefer prepared a "value engineering report" recommending to Masone two alternatives for dealing with the ground conditions; each would have increased the cost of the project.

23. Masone rejected both alternatives. As a result, Schaefer had to wait for the ground to dry out naturally.

24. On May 28, 2010, VCG wrote to Schaefer to advise that a portion of the subbase was not being prepared in accordance with specifications. Although VCG threatened to send a formal notice to cure if the problem was not rectified, it took no further action.

## C. Payment

25. Although the Subcontract contemplated periodic payments, it did not assign dollar values to individual components of the work. Approximately one month after the Subcontract was signed, VCG instructed Schaefer to break down the contract price into 27 line items. Schaefer was to submit periodic applications for payment reflecting the percent of each item completed during the period.

26. Over the course of the Subcontract term, Schaefer submitted the following applications:

| Pl.'s Ex. No. | Period Ending | Value of Work | Retainage (10%) | Total Earned (90%) |
|---|---|---|---|---|
| 21 | 4/15/10 | $65,300 | $6,530 | $58,770 |
| 22 | 5/27/10 | $71,300 | $7,130 | $64,170 |
| 23 | 7/08/10 | $100,030 | $10,003 | $100,030 |
| 24 | 7/08/10 | $128,390 | $12,839 | $115,551[2] |

---

[2]There were two applications for the period ending July 8, 2010. One was marked, "As I see it. Nick"; the other, "As per Joe."

| 25 | 8/12/10 | $214,340 | $102,280 | $112,060[3] |
| 26 | 9/1/10 | $219,440 | $21,944 | $197,496 |

Thus, as of September 1, 2010, Schaefer had performed work worth $219,440.

27. In response, VCG made the following payments– either to Schaefer or jointly to Schaefer and his subcontractors:

| Date | Description | Amount Paid |
|---|---|---|
| 6/8/2010 | To Schaefer | $24,750.00 |
| 7/7/2010 | To Schaefer | $34,020.00 |
| 7/30/2010 | To Schaefer | $25,210.00 |
| 7/30/2010 | To Schaefer | $26,000.00 |
| 7/30/2010 | To Quality Control Labs | $2,000.00 |
| 8/11/2010 | To Schaefer and Kirkpatrick & Sons | $25,000.00 |
| 8/27/2010 | To Schaefer and Kirkpatrick & Sons | $23,766.22 |
| 9/3/2010 | To Schaefer and Nycon Supply Corp. | $6,426.00 |
| 9/3/2010 | To Schaefer and Nycon Supply Corp. | $2,142.00 |
| 9/3/2010 | To Schaefer and Nycon Supply Corp. | $2,142.00 |
| 9/3/2010 | To Durante Rentals | $519.33 |
| 9/8/2010 | To Schaefer and Nycon Supply Corp. | $4,080.00 |

---

[3]The retainage for the August 12, 2010, application appears to have been calculated incorrectly. Ten percent of $214,340 is $21,434, making the total earned $192,906.

7

| 9/8/2010 | To Schaefer and Nycon Supply Corp. | $3,519.00 |
|---|---|---|
| TOTAL | | $179,574.55 |

Thus, as of September 8, 2010, VCG had made payments totaling $109,980 to Schaefer and payments totaling $ 67,594.55 to Schaefer's subcontractors.

**D. Termination**

28. On July 28, 2010, VCG sent Schaefer a notice to cure. In the notice, VCG claimed that nine items of work were "behind schedule" in violation of the Subcontract's "time is of the essence" clause. Pl.'s Ex. 31. It gave Schaefer two days to cure the claimed defaults.

29. On August 12, 2010, VCG sent Schaefer a notice of default, apparently based on the July 28th notice. The August 12th notice did not give Schaefer a cure period, but instead invoked the Subcontract's liquidated damages provision. It stated that "[f]rom the onset of the default . . . forward, the sum of $200.00 per day will be credited against [the Subcontract]." Pl's Ex. 31.

30. Although VCG purported to declare Schaefer in default, it did not terminate the Subcontract because Schaefer continued to perform work on the project. Schaefer testified that he was "85 completed" by the end of August. Trial Tr. 23.

31. In early September, Schaefer requested from a VCG field supervisor a partial payment of $25,000. He intended to use the $25,000 as a deposit to purchase asphalt, and testified that the purchase would have allowed him to complete the project. The request was not honored, and Schaefer never discussed the matter further with Masone or anyone else from VCG.

32. At roughly the same time, VCG was responding to the United States's concern that the project would not be completed by the September 3rd deadline. On that date, it requested an additional 48 days to complete the project. It wrote to the United States that "[t]here are several bona fide reasons for the delay." Pl.'s Ex. 30. Its letter made reference to the inability to use large crushing equipment at the site:

> The initial approach to the project was for sequential removal and crushing of each site . . . with small stockpiles of re cycle [sic] material for the curb base and road bed spread on the road at the work progressed . . . . Due to the logistics and

restrictions of the site, this logical sequence of work was not possible.

*Id.* It also referenced the ground conditions:

> [T]here was a severe rain storm rendering each site with unforeseen condition of soils holding water. No one had any knowledge of the soil conditions pre-construction. The conditions would not pass the contract required subbase compaction test of 96%. The crew was prepared to dig each area out, but after a test pit, it was realized that the entire hillside was seeping into a substantial area of the road base.The decision based on a review of the site with the testing laboratory was to heed their advice and give the site time to naturally drain as it had for year.

*Id.* The letter stated that the unanticipated problems caused a delay of 30 days "that we optimistically anticipated to make up, but in hindsight were not [able to]." *Id.* The delay had no apparent effect on the Base Contract.

33. Notwithstanding its letter to the United States, VCG sent Schaefer yet another notice to cure on September 6, 2010. Like the July 28th notice, the September 6th notice claimed that Schaefer was "behind schedule" on numerous items of work. It again invoked the "time is of the essence clause" and gave Schaefer 48 hours to cure.

34. On September 13, 2010, VCG sent Schaefer a notice of default. The notice did not offer Schaefer an opportunity to cure. Instead, it invoked its right to terminate the Subcontract.

35. After receiving the notice, Schaefer "decided to pack up his equipment and go home." Trial Tr. 69.

36. VCG engaged other contractors to complete the project. Including the amounts paid to Schaefer and his subcontractors, it expended a total of $408,992.81 on the project. That total exceeded the Subcontract price of $363,000 by approximately $46,000.

**E. Additional Work**

37. Schaefer testified that he submitted his final invoice to VCG after walking off the job. However, that invoice is dated September 10, 2010. *See* Pl.'s Ex. 27.

38. In his final invoice, Schaefer demanded the full Subcontract price of $363,000. He credited the $109,980 in payments made directly to him, but not the $67,594.55 paid to his subcontractors.

39. Schaefer also demanded payment for costs not expressly covered by the Subcontract:

| Description | Amount |
| --- | --- |
| Install additional curbing | $9,450 |
| Clean storm catch basins | $18,000 |
| Demolition and removal of concrete | $8,000 |
| Survey work | $6,000 |
| Value engineering report | $7,500 |
| Additional subbase | $15,000 |
| Wasted labor and equipment costs | $35,000 |
| TOTAL | $98,950 |

40. The additional curbing was required because the drawings provided to Schaefer by VCG inaccurately represented the total length of curbing to be installed.

41. Schaefer testified that the catch basins were filled with mud and other debris when construction began, and that he had protected them from construction debris by covering them with plywood. Masone nevertheless told Schaefer that the basins had to be cleaned out and threatened to deduct cleaning costs from the Subcontract price if he did not do so.

42. The $8,000 in concrete demolition and removal was attributable to Schaefer's inability to use large equipment to crush the material on site.

43. The $6,000 for survey work represented the man-hours needed to stake out the grades for the new roads.

44. As noted above, the value engineering report was prepared to develop means of dealing with the unanticipated ground conditions. Those conditions also required additional subbase. Schaefer testified that he would not have needed additional subbase had he been able to use the large crushing equipment to recycle the concrete from the existing roads and curbs.

10

45. Schaefer paid labor and equipment costs on several days when funeral services at the site prevented him from doing any construction. He claimed that VCG failed to give him notice of the funerals. He did not submit any documentation relating to the dates he was precluded from working, or invoices evidencing the costs he incurred.

## CONCLUSIONS OF LAW

**A. Breach**

VCG terminated the Subcontract on September 13, 2010. If, as of that date, Schaefer was in breach, then the Subcontract entitled VCG to terminate. If, on the other hand, Schaefer was not in breach, then the termination was itself a breach. "[U]nder the doctrine of anticipatory repudiation, where one party repudiates its contractual obligations 'prior to the time designated for performance,' the nonrepudiating party may immediately claim damages for total breach and be absolved from its obligations of future performance." *Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 921 N.Y.S.2d 260, 264 (2d Dep't 2011) (quoting *Long Island R.R. Co. v. Northville Indus. Corp.*, 41 N.Y.2d 455, 463 (1977)).

The stated basis for VCG's termination was that Schaefer had fallen "behind schedule," in violation of the Subcontract's "time is of the essence" clause. The Subcontract, however, did not include either a completion date or a progress schedule. "Where a contract fails to state a date for the completion of a construction project, a reasonable time is implied. What constitutes a reasonable time for performance of a contract depends upon the facts and circumstances of the particular case, including the subject matter of the contract, the situation of the parties, their intention, what they

11

contemplated at the time the contract was made, and the circumstances surrounding performance." *Teramo & Co. v. O'Brien-Sheipe Funeral Home, Inc.*, 725 N.Y.S.2d 87 (2d Dep't 2001).

Although the project suffered from delays, the principal reasons for the delays—Schaefer's inability to use large crushing equipment and the poor ground conditions—were matters not contemplated by the parties when the Subcontract was executed and, more importantly, were not attributable to a lack of diligence on Schaefer's part. In other words, Schaefer performed his obligations with reasonable diligence under the circumstances. The Court concludes, therefore, that VCG's termination of the Subcontract was not justified by a breach of the "time is of the essence" clause.

Moreover, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389 (1995). That covenant "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87 (1933)).

At virtually the same time that VCG was accusing Schaefer of unreasonably delaying performance, it was representing to the United States that the delays were due to unforeseen circumstances. That representation was explicitly made to secure additional time for performance; it was also manifestly an effort to protect its right to payment under the Base Contract. Having apparently succeeded in those efforts, VCG was obliged by

good faith and fair dealing to acknowledge the same unforeseen circumstances in its enforcement of the Subcontract.

In sum, the Court holds that VCG's termination was a breach of the Subcontract, entitling Schaefer to walk off the job and seek damages. By the same token, since Schaefer was not in breach at the time of termination, VCG is not entitled to recover the additional costs it incurred to complete the project.

**B. Damages**

*1. Work Under the Subcontract*

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987). As a general rule, courts do not permit claims grounded in quasi-contract where a valid agreement exists between the parties. *See Integral Control Sys. Corp. v. Consol. Edison Co. of N.Y., Inc.*, 990 F.Supp. 295, 303 (S.D.N.Y. 1998); *see also Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987). When, however, a contract has been wrongfully terminated prior to completion, "*quantum meruit* is the appropriate measure of damages." *MCK Bldg. Assocs., Inc. v. St. Lawrence Univ.*, 754 N.Y.S.2d 397, 399 (3d Dep't 2003). "The customary method of calculating damages on a *quantum meruit* basis in construction contracts . . . is actual job costs plus an allowance for overhead and profit minus amounts paid." *Najjar Indus., Inc. v. City of New York*, 451 N.Y.S.2d 410, 413 (1st Dep't 1982).

13

Schaefer's theory of damages does not strictly follow the "customary" method. He states that the value of his work "was at least $465,860.00." Pl.'s Post-Trial Mem. 15. Perhaps recognizing that that conclusory statement lacks adequate evidentiary support, he instead seeks 85% of the Subcontract price of $363,000 as a "reasonable measure" of his damages. *Id.*

As VCG points out, Schaefer's testimony that the project was 85% complete at the end of August 2010 is belied by his September 1st application for payment, in which he represented that the value of the work still to be performed was $143,560—nearly 40% of the total. *See* Pl.'s Ex. 26. Apart from Schaefer's final invoice—which demanded payment in full notwithstanding the undisputed fact that at least *some* work remained—there is no documentation for the value of work performed between September 1 and September 13, 2010; the Court cannot speculate as to Schaefer's damages for that period. Accordingly, the Court uses the $219,440 claimed in the September 1st application for payment as an appropriate, though imperfect, proxy for the value of Schaefer's work on the date VCG terminated the Subcontract.

Schaefer concedes that VCG is entitled to a credit of $179,574.55 for the payments it made to Schaefer and his subcontractors as of September 8, 2010. VCG claims that it made additional payments after September 8th. Unlike the pre-September 8th payments, however, the post-September 8th payments are not supported by invoices. As a result, the Court has no way of knowing which payments were made for work performed prior to termination of the Subcontract, and which were made for post-termination work

14

to complete the project. The Court will not credit VCG for any post-September 8th payments.

In sum, Schaefer is entitled to $39,865.45 in *quantum meruit* damages for work performed under the Subcontract.

## 2. *Additional Work*

With respect to Schaeffer's claims for additional work, it was his burden to prove both "the work he actually performed [and] a reasonable value for those alleged services." *Nemeroff v. Coby Group*, 864 N.Y.S.2d 25, 26-27 (1st Dep't 2008) (citations and internal quotation marks omitted). The only evidence of the value of the work was Schaeffer's testimony and his final invoice to VCG. While the Court can accept that evidence as proof that Schaefer actually performed the work, *cf. Najjar Indus.*, 451 N.Y.S.2d at 413 ("This is not to say that in a proper case oral testimony of actual costs may not be acceptable."), he did not present any evidence as to what portion of the amounts claimed in his final invoice represented actual costs, and what portion represented overhead and profit. Moreover, he did not present any evidence that the billed amounts were reasonable. For those reasons, the Court concludes that Schaefer failed to prove any *quantum meruit* damages for additional work. *See Mary Matthews Interiors, Inc. v. Levis*, 617 N.Y.S.2d 39, 41 (2d Dep't 1994) ("Even assuming that a *quantum meruit* theory might have been available to the plaintiff in connection with the work . . . , the plaintiff failed to produce detailed proof sufficient to permit an assessment of the reasonable value of its services with respect thereto.").

*3. Prejudgment Interest*

New York law mandates prejudgment interest in contract actions. *See* N.Y. C.P.L.R. § 5001(a). That mandate extends to *quantum meruit* awards. *See Ogletree, Deakins, Nash, Smoak & Stewart P.C. v. Albany Steel Inc.,* 663 N.Y.S.2d 313, 315 (3d Dep't 1997). Prejudgment interest begins to accrue on "the earliest ascertainable date the cause of action existed," N.Y. C.P.L.R. § 5001(b), at an annual rate of 9%, *see id.* § 5004.

Schaefer clearly had a cause of action for breach of contract by September 13, 2010. On a principal of $39,865.45, prejudgment interest accruing at 9% per year from that date totals $11,703.76 as of today's date.

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court (1) awards Schaefer $39,865.45 and $11,703.76 in prejudgment interest, for a total of $51,569.21; and (2) dismisses VCG's counterclaims. The Clerk shall enter judgment accordingly.

**SO ORDERED.**

                                              /S/ Frederic Block
                                              FREDERIC BLOCK
                                              Senior United States District Judge

Brooklyn, New York
December 16, 2013